Ike MURRY, Trustee in Bankruptcy of the Estate of Arkansas Business Development Corporation, Bankrupt, Plaintiff,

v.

James F. HALE et al., Defendants.
William M. Wallace et al., Intervenors.
No. LR-60-C-119.

United States District Court
E. D. Arkansas, W. D.
March 30, 1962.

D. D. Panich, Little Rock, Ark., for plaintiff.

Guy B. Reeves, Little Rock, Ark., for defendants.

Jay W. Dickey, Pine Bluff, Ark., and Edward L. Wright, Jr., Little Rock, Ark., for intervenors.

HENLEY, Chief Judge.

This suit in equity was brought by the trustee of the estate of Arkansas Business Development Corporation (ABDC), a bankrupt, against certain named defendants who are sued individually and as representatives of a class. After the action was commenced, additional parties intervened, aligning themselves with the defendants in opposition to the claims of the trustee.

The purpose of the suit is to secure an adjudication of ownership of and interests in certain securities, principally loan collateral such as mortgages, which securities are in the physical possession of plaintiff. Plaintiff claims that the securities in question are assets of the bankrupt estate and should be liquidated with the proceeds being distributed to the general creditors of ABDC. Defendants and intervenors take the position that certain of the securities belong to them and that their claims are superior to those of the trustee.

The cause has been tried to the Court and submitted upon the pleadings and exhibits thereto, certain discovery material, a stipulation of facts, documentary evidence, oral testimony, and written briefs. This memorandum incorporates the Court's findings of fact and conclusions of law.

The record discloses that ABDC, an Arkansas corporation, was chartered in 1958 and engaged in the business of lending money and making investments. The corporation controlled four affiliates which engaged in financial activities of various kinds.[1] Whether by reason of fraud, mismanagement, or some other cause ABDC was hopelessly insolvent by the spring of 1960. An involuntary petition in bankruptcy was filed against it on June 7, 1960, and adjudication followed on June 20. Subsequently, plaintiff was named trustee of ABDC's estate.

During the period of its operations ABDC sold stock to the public and solicited deposits of money for investment. In theory, the money deposited by a given investor would be used to purchase secured or unsecured notes or accounts receivable due merchants on account of merchandise sold to consumers, or to purchase notes secured by first or second mortgages on Arkansas real estate. The investments were supposed to yield interest at rates varying from ten to six percent per annum.

A considerable number of people, including defendants and intervenors, put money into the investment program. The total amount deposited was approximately $500,000, of which sum about $117,000 was refunded from time to time to certain investors. Interest amounting to about $38,000 was paid to depositors from month to month. The charges which ABDC made for the handling of investments were nominal, and it is difficult to see how ABDC planned to make any money legitimately out of the investment program.

Upon making a deposit with ABDC the depositor would sign an "account authorization" and would receive from ABDC a numbered "trust receipt." With minor variations in verbiage and with differences as to interest rates the account authorizations and trust receipts were

---

1. Those affiliates were Financial Security Corporation, Jefferson Finance Co., Lenders Service, Inc. v. Capitol Building Investment Co. Lenders Service, Inc. is now in bankruptcy. The record does not disclose the present status of the other affiliates, but it is fairly inferable from what is before the Court that they are probably insolvent and that their outstanding obligations are worthless or nearly so.

standard in form. A typical account authorization and a typical trust receipt are reproduced herewith as Figure **1** and Figure 2.

FIGURE 1 ACCOUNT AUTHORIZATION *Petff 9*

Account Number TA– *599*

Name *SUSIE F. HALE AND/OR JAMES F. HALE* Phone _____

Address *738 DAVIES ST.* City *CAMDEN, ARK.* Zone _____

The undersigned hereby remits the sum in full of $ *6700.00* to:

**ARKANSAS BUSINESS DEVELOPMENT CORPORATION**
ABDC Bldg., 518 Scott — — Little Rock, Arkansas

to be used and handled in accordance with the following terms and conditions:

1. Until used as hereafter provided, said sums shall be deposited in a bank in your name as Trustee for the undersigned and others who authorize like accounts with you.

2. You are authorized as principal, to sell to the undersigned any or all of the following as indicated below: *(Check one or both)*

 ☒ A. Accounts receivable for merchandise sold and delivered, either secured or unsecured, which accounts in your opinion, are prudent investments and which will provide a yield to me equivalent to *10%* per annum.

 ☒ B. Notes secured by first or second Trust Deeds or mortgages on Arkansas real estate; it being understood that such notes will be obtained by me at terms that will provide the undersigned a yield equivalent to *10%* per annum.

 NOTE: *Money retained in the Trust Accounts under Paragraph 1 is not entitled to interest or other increment unless the amount is $500.00 or over.*

3. You are authorized and instructed to make all collections on transactions that you negotiate for this account for which you may deduct a flat one time fee of $25.00.

4. *Without loss to me* you are authorized to sell any obligation purchased for my account or call due and payable any loan which you have negotiated for my account, should such obligation or loan become forty-five (45) days delinquent in payment.

5. You are authorized to dispose of any obligation acquired for my account should you deem it advisable for the best interest or safety of my account.

6. The undersigned reserves the right to institute foreclosure proceedings or other suit for collection of any documents purchased for this account.

7. All documents purchased for this account shall forthwith, by appropriate instrument, be assigned to the undersigned and maintained by you as a trust account, and you shall notify me of such acquisitions.

8. You are instructed to mail me a check for the interest each month and deposit the balance in the Trust Account as per paragraph 1.

9. If at any time I so instruct you by thirty (30) days notice in writing, you shall deliver to me all cash in my Trust Account and/or documents held for this account.

10. You are authorized to deduct from my account all interest paid on any funds I withdraw within one year from date of this contract.

You are to act on any written instruction carrying the signatures below.
Make all checks payable to ABDC—Trustee.

Dated *April 9* 19 *59* Signature *James F. Hale*

Signature *Susie F. Hale*

WITNESSED

Arkansas Business Development Corporation

By *J. C. Kerby*

BY INVITATION ONLY TO
RESIDENTS OF ARKANSAS

FIGURE 2

# TRUST RECEIPT

TA NUMBER __647__ DATED __7-3-59__

## ARKANSAS BUSINESS DEVELOPMENT CORPORATION

### (AN ARKANSAS CORPORATION)

This certifies that *J.T. AND LETTIE W. / MARTIN* has deposited __SIX THOUSAND DOLLARS__ as per terms and conditions of an account authorization executed same date of this Trust Receipt to earn _10%_ per annum. The above named depositor upon presentation of this certificate is entitled to all privileges appropriate to this trust status:

This receipt not valid until signed by a duly authorized officer of ABDC.

_____
Authorized Signature

NON-TRANSFERABLE

---

During its active life ABDC made numerous loans of money and acquired various items of collateral some of which were much more valuable than others. In addition, ABDC purchased obligations evidencing loans made by others, including its own affiliates. Those loans and purchases were ultimately made, in large measure, out of funds invested by depositors.

ABDC's dealings with its own affiliates were substantial. It has been stipulated that direct loans to affiliates amounted to the gross sum of $136,449.91, the discount on those loans was $7,324.91, and the net amount advanced ultimately out of deposited funds was $129,125.00, of which sum $104,765.41 remains unpaid. It has been stipulated further that ABDC purchased from its affiliates obligations totalling $224,985.32, that after making appropriate deductions for discounts the net amount of those purchases borne by invested funds was $202,961.51, and that of the amount last mentioned $154,843.93 remains unpaid.

ABDC maintained two bank accounts, one of which may be called its "general account" and the other its "trust account." Deposits with ABDC were placed in the trust account, and all funds so deposited were fully commingled. At the time of the bankruptcy the balance in the trust account was a little more than $21,000, which balance was transferred to the plaintiff as trustee.

When ABDC acquired collateral, either as a result of direct loans or by purchases of obligations in favor of others, it did so out of its own general account and in its own name. From time to time the general account was replenished by the transfer of funds from the trust account, and when trust account funds came over into the general account, they were fully commingled with ABDC's own funds in that account.

From time to time ABDC purported to make allocations of collateral to various depositors by means of instruments entitled "Assignment of Notes." By means of such an assignment one or more items of collateral would be assigned by ABDC as corporate holder of the

588

collateral to itself as trustee for the depositor involved. A typical assignment is reproduced herewith as Figure 3.

FIGURE 3

ASSIGNMENT
OF
NOTES

*TA599*

KNOW ALL MEN BY THESE PRESENTS:

THAT, for and in consideration of ONE DOLLAR ($1.00) and other good and valuable considerations, the receipt of which is hereby acknowledged, the undersigned does hereby grant, bargain, sell, transfer, assign and convey unto ARKANSAS BUSINESS DEVELOPMENT CORPORATION TRUSTEE FOR *SUSIE F. &/OR JAMES F. HALE* all of its right, title and interest in and to certain *NOTE* executed by *LENDERS SERVICE COMPANY, INC., SECURED BY A CERTAIN CHATTEL MORTGAGE, DATED 11-3-59 IN THE PRINCIPAL SUM OF $27,299.45, IN SO FAR AS THEIR INTEREST MAY APPEAR,* in favor of said undersigned.

And for the same consideration, the undersigned for itself and its successors, representatives and assign does covenant with the said assignee, his successors, or assigns, that it is the lawful owner of said note and privileges thereunder and that it has good right and authority to sell and convey the same.

IN WITNESS WHEREOF, the said corporation has caused this instrument to be executed by its *VICE. PRES.* and attested by its *ASST. SECRETARY* and its corporate seal to be hereto affixed this *3* day of *NOVEMBER* 19 *59*

ARKANSAS BUSINESS DEVELOPMENT CORPORATION
A CORPORATION
BY _____
Vice President

ATTEST:

Patricia Lawrence
Asst. Secretary

(Seal)

ACKNOWLEDGMENT

STATE OF ARKANSAS
COUNTY OF PULASKI

On this *3* day of *NOVEMBER* 19 *59* before me *MILDRED THOMPSON* a notary public, duly commissioned, qualified and acting within and for said county and state, appeared in person *W.G. BEARD* and *PATRICIA LAWRENCE* to me personally well known, who stated that they were *VICE. PRES.* and *ASST. SEC.* of ARKANSAS BUSINESS DEVELOPMENT CORPORATION, a corporation and that they were duly authorized in behalf of said corporation and further stated and acknowledged that they has so signed, executed and delivered said foregoing instrument for the considerations, uses and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this *3* day of *NOVEMBER* 19 *59*.

Mildred Thompson
Notary Public

MY COMMISSION EXPIRES:
*NOVEMBER 7, 1960*

It is noted at this point that with respect to the defendant Stella V. Hall, and with respect to the intervenors William M. Wallace, Olive O. Wallace, J. T. Martin, and Lettie Martin, the record reflects that after "Assignment of Notes" had been executed in favor of those depositors, ABDC also executed and acknowledged standard forms of "Declaration of Trust" reciting that ABDC held the collateral assigned to the defendant and intervenors just mentioned as trustee for said defendant and intervenors.

While the account authorizations contemplated that the respective depositors would be notified when securities were acquired for their accounts, no notices of the purported assignments were given, and no collateral was physically delivered to any depositor, although items of collateral purported allocated to a particular depositor may have been placed in a separate file set up for such depositor and the assignment itself may have been placed in that file. In any event, both the collateral and the assignments were at all times subject to the full physical control of ABDC.

The account authorizations gave the respective depositors the right upon 30 days' notice to withdraw "all cash in my Trust Account and/or documents held for this account." While a number of depositors availed themselves of this right, it is to be observed that in all cases the withdrawing depositors were paid entirely in cash.

There is no evidence that ABDC acted in collusion with any particular depositor or depositors in the allocation of collateral or that it intentionally discriminated against any particular depositor or group of depositors, but the evidence does show that, except for a very short period of time at the beginning of operations, the allocations were entirely haphazard and arbitrary. One depositor might obtain a valuable item of security, another might be allocated a security of less value, and many depositors received no allocations at all. To further complicate the situation, it appears that in instances a considerable period of time would elapse between the date of a deposit and the date upon which collateral would be allocated to the individual depositor.

Upon occasion ABDC would acquire an item of collateral the face amount of which exceeded the deposit of any single depositor. In such a situation the collateral would be assigned to a number of depositors "as their interests might appear." A noteworthy example of such an assignment is the item of collateral referred to in the record and briefs as the "Shore Acres Mortgage." A brief account of the Shore Acres transaction follows.

On March 9, 1959, ABDC made certain loans to a real estate development concern known as Creswell-Keith, which loans totalled $17,425.00. Of this amount the trust account bore $16,379.00 with the balance being borne by ABDC itself. (Plaintiff's Exhibit 1b, Schedule 2.) On July 17, 1959, ABDC made another loan to Creswell-Keith in the sum of $68,472.23 all of which was at the ultimate cost of the trust account. On July 23, 1959, the original loans amounting to $17,425.00, plus interest, were paid off by Creswell-Keith, leaving a principal balance of $68,472.23.

In the meantime a corporation known as Shore Acres, Inc. had been formed. It took over the Creswell-Keith loan of $68,472.23 and on or about July 17, 1959, executed in favor of ABDC a mortgage to secure that indebtedness. The mortgage covered certain real estate in Garland County, Arkansas, near Hot Springs.

On February 11, 1960, when the balance due on the Shore Acres loan, including interest, was $50,233.75, ABDC made a new loan of $20,000.00 to Shore Acres. This loan was made directly out of the trust account. In connection with this new loan, the original mortgage was released of record, and a new mortgage was taken covering the same property and securing a total obligation of $70,736.09, which total was made up of the balance of the $68,472.23 debt, $502.34 interest on the old debt, and the new loan of $20,000.00. As of September 8, 1960, the balance secured by the second Shore Acres mortgage was $60,406.29, which balance took into account a payment made by Shore Acres on that day. Since September 8, 1960, which was well after bankruptcy, no payments have been made on the Shore Acres loan.

Returning now to the overall situation, the record discloses that during its

operations ABDC paid interest to its depositors in accordance with the rates set forth in the respective account authorizations. Those payments were made out of the trust account, and since the collateral allotted to the several depositors at no time earned enough income to make the interest payments called for by all of the account authorizations it follows that the making of those payments in full invaded and depleted the corpus of the trust account.

It has been pointed out that none of the depositors received any notices of the allocations of collateral made by ABDC. After the bankruptcy, however, a number of depositors discovered that collateral of some value had been allocated to them, and they made demand upon plaintiff for the delivery of the specific items of collateral so allocated. Plaintiff refused those demands and instituted this action to determine ownership of the collateral held by him. While not so denominated formally, the action is essentially one for a declaratory judgment. Jurisdiction, which is not challenged, is predicated upon sections 23, 60, and 70 of the Bankruptcy Act as amended 11 U.S.C.A. §§ 46, 96, and 110.

In his original complaint plaintiff characterized the deposits made by defendants and others similarly situated as trust funds, and recognized that those funds had gone into collateral acquired by ABDC, which collateral was impressed with a trust. Plaintiff took the position, however, that due to the commingling of the funds of the various depositors, the further commingling of trust funds with the general funds of ABDC, and the arbitrary manner whereby items of collateral were purportedly allocated, the funds of no depositor could be traced into any particular item of collateral, and that all of the trust collateral should be liquidated by the trustee and the proceeds distributed to the depositors pro-rata. The prayer of the original complaint was as follows:

"Wherefore, plaintiff prays * * * :

"(a) That none of the defendants named herein or any person or persons constituting a member of the said class is entitled to recover any particular collateral in the hands of plaintiff as trustee in bankruptcy * * * whether said collateral or any part thereof be assigned to an individual investor or not.

"(b) That each of the defendants named herein and all other persons constituting members of the same class of investors be restrained from instituting any action against plaintiff for the recovery of their respective trust deposit or the collateral assigned to said trust deposit.

"(c) That the Court order and decree that all of the assets belonging to the trust estate in the hands of the plaintiff as trustee in bankruptcy be held to be the assets of all trust investors jointly; that said assets be liquidated by plaintiff and the proceeds thereof distributed to said investors on a parity after payment of costs of administration as allowed by the Bankruptcy Court.

"(d) That plaintiff have judgment for his costs herein expended and for all other relief to which plaintiff may be entitled."

In an amendment to the complaint, allowed by the Court, plaintiff assumed a broader position and one less favorable to the depositors. In that pleading plaintiff alleged that the account authorizations authorized the commingling of deposited funds, that such funds could not be separately identified, that the true relationship between ABDC and its depositors was that of debtor-creditor rather than that of trustee-beneficiary, and that the depositors should be held to be unsecured, common creditors of the estate of ABDC. The prayer of the amendment was that the defendants and

other members of the class be held to be unsecured, common creditors.

It is the position of the defendants and intervenors that the initial relationship between the depositors and ABDC was one of trust, that the commingling of the trust funds did not destroy the trust, that the funds of particular depositors are traceable into the collateral allocated to such depositors, and that such depositors are entitled to the specific collateral allocated to them as against the claims of the plaintiff and of other depositors.

## I.

The Court finds itself in agreement with plaintiff in his original characterization of the relationship between ABDC and its depositors as one of trust and rejects plaintiff's later contention that the relationship was simply that of debtor and creditors.

The Court is persuaded that the intention of the parties manifested in the account authorizations and the trust receipts was that the deposits be held in trust pending the purchase of securities for the several accounts, and that the securities when so acquired should also be held in trust. The Court is also convinced that the original deposits did not lose their character as trust funds merely because the funds of individual depositors were commingled in the trust account with the funds of other depositors.

The characterization of the relationship between ABDC and its depositors depends upon Arkansas law. It is the law of Arkansas that a trust is created when property is conferred upon one person and accepted by him for the benefit of the other or for the benefit of a third person. In order to constitute a trust two things are essential: (1) that the ownership conferred be connected with a right, interest, or duty for the benefit of another; and (2) that the property be accepted on those conditions.

Vaughan v. Shirey, 212 Ark. 935, 208 S.W.2d 441; Carr v. Harrington, 107 Ark. 535, 155 S.W. 1166. In the absence of a statute to the contrary, the owner of property may create a trust therein for any lawful purpose which he may deem wise or desirable, and the trust may be created for his own benefit as well as for the benefit of another. Hardy v. Hardy, 217 Ark. 296, 230 S.W.2d 6; Gall v. Union National Bank, 203 Ark. 1000, 159 S.W.2d 757; Cribbs v. Walker, 74 Ark. 104, 85 S.W. 244; United Bldg. & Loan Ass'n v. Garrett, W.D.Ark., 64 F. Supp. 640. Whether a given transaction amounts to the creation of a trust depends primarily upon the manifested intent of the parties. Krickerberg v. Hoff, 201 Ark. 63, 143 S.W.2d 560; Cox v. Wasson, 187 Ark. 452, 60 S.W.2d 566; Kansas City Life Insurance Co. v. Taylor, 184 Ark. 772, 43 S.W.2d 372; Restatement, Trusts, 2d, § 23.[2]

A loan is not a trust. Restatement, § 12. And where the subject matter of an alleged trust is money, a distinction must be drawn between a transfer of funds which creates a trust and a mere general deposit or loan of money with or to the transferee, in which latter case no trust is created.

Generally, in the case of a loan the borrower receives the beneficial use of the money for his own ends, his sole obligation being to repay the loan at a given time or on demand either with or without interest, depending upon the agreement of the parties. In case of a trust the trustee does not receive the money for his own use and benefit, but holds it for the benefit of the cestui que trust, whether the cestui be the original transferor or a third person. Repayment, in the sense that borrowed money is to be repaid, is usually not a factor where a trust is created, and the payment of interest on the funds transferred is ordinarily not an incident of a trust relationship, although in instances it may be. The relationship between a trustee and a beneficiary is a fiduciary

2. Further citations to the Restatement refer to Restatement, Trusts, 2d.

592

one, whereas the relationship between a debtor and his creditor is not fiduciary. Restatement, § 12 and comments following; 89 C.J.S. Trusts § 2, p. 714.

■ Where a single trustee holds the funds of several beneficiaries, it is doubtless the better practice in general for him to maintain the separate identity of each fund and not to mingle the funds in a common bank account. However, regardless of what the law once may have been, under the modern view such a commingling does not destroy the trust character of the commingled funds, and it is sufficient if there are made accurate records which reflect the deposits made by the respective beneficiaries.

In section 179 of the Restatement it is said that it is the duty of the trustee to keep the trust property separate from his own individual property, and "so far as it is reasonable that he should do so" to keep it separate from other property not subject to the trust. And in Comment "c" following the section just cited it is said:

"It is ordinarily the duty of the trustee not to mingle property held upon one trust with property held upon another trust, whether the two trusts are created by separate settlors or by the same settlor.

\* \* \* \* \* \*

"Where the trustee holds the funds of numerous beneficiaries, and it would be unreasonable and not subserve any purpose in protecting the interests of the beneficiaries of the several trusts to require him to keep separate the funds of the different trusts, it may be proper for the trustee to mingle funds of the different trusts by deposit thereof in a common bank account. Thus, ordinarily a trust company can properly deposit in a single trust account in another bank the funds of several trusts, provided that it keeps an accurate record of the contributions of the separate trusts. \* \* \*"

And in 54 Am.Jur. Trusts, § 257, it is stated that the ancient "earmark doc-

trine" that "trust money having no earmarks loses its identity on being commingled with other money" has been largely repudiated in this country. The same work also says, § 263, that where a trustee of different trusts commingles the properties of the separate trusts "restitution will be made to the innocent beneficiaries in proportion to the commingling, in so far as possible, out of the trust in which the properties and funds of the other trusts have been commingled, or out of the property, funds, or accounts of the trustee in which the trusts have been commingled, and they may maintain a suit in equity to have the mass charged with equitable liens and sold for their benefit, and the distribution of the proceeds made to the extent of the liens adjudicated in the cause." Further, in 90 C.J.S. Trusts § 438, p. 844, it is said that where a conscious wrongdoer commingles money of others but not his own "each owner of the money is entitled to share in the mingled fund or in property acquired with the fund in such proportion as his money bore to the whole amount of the fund, and the owners share the profits and losses equally."

■ It does not appear that Arkansas has adopted the old "earmark" doctrine, and there is no reason to believe that it would do so at this late date.

■ Applying the foregoing principles to the facts at hand, it is clear that the deposits were made for a limited purpose and with the intent to create a trust. ABDC was not free to use the deposits as its own, but was to use them for the acquisition of securities for the respective depositors, which securities were to yield to the depositors the stipulated rates of interest. Prior to the acquisition of the contemplated securities the deposits were to be put in the bank and held by ABDC "as Trustee." After the securities were acquired, they were to be assigned immediately to the respective depositors, who were to be notified of the assignments, and the assigned

securities were to be maintained as a "trust account." That after the allocations of collateral ABDC was to have broad powers of control over and disposition of such collateral does not militate against the existence of a trust. Trustees frequently have the power to exercise broad control over the trust corpus, including the power to sell securities held in trust, to exchange such securities for other securities, and to "invest and reinvest" corpus and proceeds.

 The interest which the depositors were to receive from their investments was supposed to be earned by the collateral purchased for them. ABDC itself was not required to pay interest on the balance in a depositor's account unless that balance exceeded $500. If the balance did exceed $500, interest was to be paid by ABDC. The Court does not consider that provision as negativing the existence of a trust. As the Court sees it, the provision for interest on moneys in excess of $500 retained on deposit was inserted as a stimulus to ABDC not to retain money on deposit any longer than was necessary to enable ABDC to find a suitable investment for such money. After such an investment was found and made, the depositor was required to look to the investment for his interest income.

 As to the commingling of the deposits in the common trust account, it would have been entirely unreasonable to require ABDC to open a separate bank account for every depositor, and no useful purpose would have been served by the opening of such separate accounts. On the other hand, had ABDC opened and maintained a separate account for each depositor, the administration of the program would have been much more burdensome and expensive. In the Court's estimation it was permissible for ABDC to keep the funds in one account, provided it kept records of the amounts deposited by the individual depositors, and this was done by means of an account card for each depositor, showing the date and amount of each deposit and the current status of the account.

 True, the program was not administered in the manner contemplated by the account authorizations, and that fact amounted to a breach of the duty which ABDC owed to its depositors. But the manner in which the program was actually administered neither terminated the trust relationships nor impeached the validity of the original trusts.

## II.

 The Court is also of the view that to the extent that collateral was acquired by ABDC by the use of trust funds, such collateral is impressed with an implied trust or a lien in favor of the depositors generally, and that the claims of the depositors are superior to the claims of the general creditors and stockholders of ABDC. That ABDC recognized that the collateral so acquired was trust property is clear, and it will be remembered that when the plaintiff commenced this action originally, he proceeded upon the theory that the collateral in question was impressed with a trust.

 It is a well settled principle that where trust funds are converted into property of another form, the trust follows the funds into the property so long as the funds can be traced or until the rights of innocent third parties intervene. Rainwater v. Wildman, 172 Ark. 521, 289 S.W. 488; Clark v. Spanley, 122 Ark. 366, 183 S.W. 964; Red Bud Realty Co. v. South, 96 Ark. 281, 131 S.W. 340; Johnson v. Johnson, W.D. Ark., 155 F.Supp. 473; In re Van Meter, W.D.Ark., 135 F.Supp. 781; Restatement, § 202. Where a trustee commingles trust funds with his own funds, and out of the commingled mass of funds purchases property in his own name, "the beneficiary is entitled at his option either to claim a proportionate share of the product, or to enforce an equitable lien upon it to secure his claim for reimbursement." Restatement, § 202, com-

594

ment "h." In such cases the claim of the beneficiary is superior to the claims of the general creditors of the trustee. Restatement, § 202, comment "o."

As stated, collateral acquired by ABDC usually was paid for initially out of the general account of ABDC, which account was replenished from time to time out of the trust account. Indulging the probably unwarranted assumption that ABDC so handled its bank accounts that the transfers from the trust account to the general account were purely by way of reimbursement for ABDC funds which had been used to pay for securities originally, and that such securities had not been acquired by the use of commingled funds, the Court considers that fact to be immaterial. ABDC obviously contemplated reimbursing its general account out of the trust account, and the trust account, to the extent that it was used by ABDC, was the ultimate source of the funds with which securities were acquired. In the circumstances it makes no difference whether trust account funds were used originally to acquire collateral, or whether such funds were first commingled with ABDC funds and the securities acquired by the use of commingled funds, or whether the initial funds were the sole property of ABDC, the trust account funds being used solely for purpose of reimbursement. To base distinctions on such considerations would be to elevate form above substance, which should not be done.

III.

While the Court characterizes the original relationship between ABDC and its depositors as one of trust, and while it finds that the collateral acquired with trust funds is impressed with a trust or lien in favor of the defendants and intervenors, and other depositors similarly situated, the Court is not able to agree with defendants and intervenors that particular depositors are entitled to have trusts impressed in their favor upon the particular collateral purportedly allocated to them by ABDC.

In view of the methods whereby trust funds and collateral were handled and purportedly allotted, it is impossible to trace the funds of any particular depositor into any particular item of collateral, or even to say that ABDC had any particular depositor in mind when it acquired any particular collateral. Hence, in order to establish their individual claim to particular collateral defendants and intervenors must rely solely on the assignments which have been mentioned and on the declarations of trust in the few instances in which the latter documents exist.

Had the collateral acquired by ABDC from time to time been of reasonably uniform value, and had there been any rational system whereby items of collateral were assigned to individual depositors, the Court would be inclined to sustain the assignments and declarations and the individual claims based thereon. However, the collateral varied greatly in value, most of it is probably worthless, and the purported allocations of the collateral were purely arbitrary.

To give effect to the allocations in such circumstances would be, in effect, to confirm the results of what amounted to a lottery. This the Court is not willing to do. Instead, the collateral acquired with trust funds will be treated as one commingled mass of trust property, or property subject to a lien in favor of the defendants, intervenors, and other depositors similarly situated, their claims to be superior to the claims of ABDC's common creditors and stockholders. Included in this commingled mass of property will be the second Shore Acres mortgage and the debt secured thereby.

In coming to this conclusion the Court is willing to recognize that the assignments and the declarations were valid as between the depositors and ABDC and as against common creditors of ABDC. But the fact remains that all of the collateral acquired by ABDC by use of the trust account was acquired by means of commingled trust funds, and

as among the respective trust depositors each has a lien for his pro rata interest in the entire mass of trust collateral without regard to the purported allocations of particular collateral to particular depositors, and without regard to the forms which the purported allocations took. That ABDC executed more documents or better documents in certain instances than it did in others is not material.

Title to the collateral in the hands of plaintiff will be confirmed in him as trustee for the depositors entitled to participate in the collateral, and the trustee will be directed to proceed to liquidate the collateral with all reasonable diligence, initiating appropriate legal or equitable proceedings where necessary, and to make proper distribution of the proceeds. This directive to the plaintiff will specifically authorize him to take steps to foreclose the Shore Acres mortgage in the proper State court.

It may be assumed safely that the proceeds of the liquidation will not be sufficient to satisfy in full the claims of all depositors entitled to participate in the fund. Hence, distribution will be made pro rata. Restatement § 202, Comment "m"; 54 Am.Jur. Trusts §§ 263 and 265.

The result here reached and the adjudication here made coincide in general with the relief prayed for in the original complaint, except that plaintiff has shown no need for injunctive relief, and none will be granted, at least at this time. Nor will the costs of this action be taxed against the defendants and intervenors generally, but the costs will be taxed against the overall fund.

The Court realizes that in carrying out the Court's directives the trustee in bankruptcy may encounter some problems in determining who is entitled to participate in the fund, and what collateral in his hands was acquired with trust funds, and how distribution of the proceeds of the collateral should be made. Such problems, if they do arise, can be solved in the bankruptcy proceedings or by means of further litigation in this Court if necessary.

A decree in accordance with the foregoing will be entered.